```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEBRASKA
 2

 3      THE UNITED STATES OF AMERICA,   )    Case Nos. 8:13CR108
                                        )      and 8:15CR239
 4                       Plaintiff,     )
                                        )
 5              vs.                     )
                                        )
 6      KIRK COTTOM,                    )
                                        )       Omaha, Nebraska
 7                       Defendant.     )     December 16, 2015

 8

 9                        TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE JOSEPH F. BATAILLON
10                  UNITED STATES SENIOR DISTRICT JUDGE

11                      A-P-P-E-A-R-A-N-C-E-S

12      FOR THE PLAINTIFF:            Mr. Keith A. Becker
                                      Trial Attorney
13                                    U.S. Department of Justice
                                      1400 New York Ave., NW
14                                    Suite 600
                                      Washington, DC 20530
15
                                      Mr. Michael P. Norris
16                                    Assistant U.S. Attorney
                                      1620 Dodge Street, Ste. 1400
17                                    Omaha, Nebraska 68102-1506

18      FOR THE DEFENDANT:            Mr. Joseph L. Howard
                                      Dornan, Lustgarten & Troia PC
19                                    1403 Farnam Street, Ste. 232
                                      Omaha, Nebraska 68102
20

21      COURT REPORTER:              Ms. Susan M. DeVetter, RDR, CRR
                                      Official Court Reporter
22                                    Hruska Courthouse, Suite 3130
                                      111 South 18th Plaza
23                                    Omaha, Nebraska 68102-1322
                                      (402) 661-7309
24

25      Proceedings recorded by mechanical stenography, transcript
        produced with computer.
```

```
 1              (At 8:32 a.m. on December 16, 2015; with counsel and the
 2      defendant present:)
 3              THE COURT:  Please be seated.
 4          This is the case of United States of America versus Kirk
 5      Cottom, Case No. 15CR239.
 6          Would the attorneys please enter their appearance for the
 7      record.
 8              MR. BECKER:  Keith Becker for the United States.
 9      Good morning, Your Honor.
10              THE COURT:  Good morning.
11              MR. NORRIS:  Michael Norris for the United States.
12      Good morning.
13              MR. HOWARD:  Good morning.  May it please the Court,
14      Your Honor, Joseph L. Howard on behalf and with Mr. Kirk
15      Cottom.
16              THE COURT:  So, Mr. Howard, you have filed a motion
17      to withdraw guilty plea in this matter.
18          And so is this simply -- do you intend to present any
19      evidence or just argument?
20              MR. HOWARD:  Your Honor, we're going to just argue to
21      the Court.
22              THE COURT:  Okay.  So you may proceed.
23              MR. HOWARD:  Thank you.  May I stand?
24              THE COURT:  I'd prefer it, yes.
25              MR. HOWARD:  Good.  Thank you, sir.
```

1    Your Honor, in filing number -- I believe it's 52 [*sic*] on

2    the new docket, and forget what the other filing number was on

3    the other docket, but essentially, Your Honor, in both cases,

4    we filed a motion to withdraw Mr. Cottom's plea of guilty.

5    We review Federal Rule of Criminal Procedure 11(d),

6    withdrawing a guilty or no contest plea.  A defendant may

7    withdraw a plea of guilty or -- or nolo contendere:  (1) before

8    the court accepts the plea.

9    Well, in this case, Your Honor, the Court has accepted the

10   plea.  If you recall, on August 3rd of this last year, we had a

11   motion hearing, sir, and following the disposition of the

12   motion hearing, we went immediately into a plea hearing --

13        THE COURT:  Correct.

14        MR. HOWARD:  -- wherein we presented the Court with a

15   petition for a change of plea as well as a plea agreement,

16   which were both filed in both cases.

17   Going back to Criminal Rule of Procedure No. 11(d),

18   sub (2), after the court accepts the plea, but before it

19   imposes a sentence.

20   Okay, so the defendant may withdraw the plea after the

21   Court accepts the plea, in this case, but before it imposes the

22   sentence.  Again, this is where we are:  If the court rejects

23   the plea agreement or, (B) if the defendant can show a fair and

24   just reason for requesting the withdrawal.

25   So, essentially, my argument is framed under the -- the

1    criminal procedure rule.

2         We need to demonstrate to the Court -- we have to persuade

3    the Court to reject the plea agreement and/or demonstrate to

4    the Court a fair and just reason for withdrawing the plea.

5         If we look at the plea agreement, and as correctly stated

6    in the response pleadings by the government, a plea agreement

7    is contractual in nature.  It's a contract.  It's a meeting of

8    the minds.

9         On August 3rd, we had the -- the hearing in which there

10   was much evidence adduced and presented to the Court.  A lot

11   of it came in pretty quickly and we were moving at a pretty

12   rapid clip.

13        It wasn't until a few days ago, I believe it was

14   December 7th, that we received the transcript of that

15   proceeding.  And reviewing the transcript of that proceeding,

16   Your Honor, in particular reviewing pages 74, 75 and 76, we

17   were reviewing the cross-examination of Special Agent Smith.

18   And Special Agent Smith testified to the Court that there were

19   no images on Mr. Cottom's machines that were on TB2.  Okay?

20   And I don't think I need to go back and argue what TB2 was,

21   sir, but at the time this didn't resonate with -- with

22   Mr. Cottom.  It wasn't until after we reviewed this that

23   Mr. Cottom definitively said, Joe, I am innocent of these

24   charges.  This new -- and I hate to say "new" because we heard

25   it on August 3rd, but it really didn't resonate with -- with us

1      and the defendant.

2          So what I'm presenting to you, Judge, is that there wasn't

3      a meeting of the minds.  Mr. Cottom didn't appreciate the

4      weight of the testimony, didn't understand exactly the weight

5      and the strength of this testimony that came out on August 3rd.

6      It wasn't until he ran through that that he found this and said

7      that's -- that's what I've been looking for.

8          All along he's -- he's maintained his innocence.  And he's

9      correct in his pleading that he was under tremendous pressure

10     from his counsel to -- to take this plea.  We're trained to

11     give the best advice possible to our clients, and that's what I

12     was doing.  And he -- he entered that plea.  But what he's

13     presented --

14              THE COURT:  So --

15              MR. HOWARD:  Sorry.

16              THE COURT:  So let me just stop you right there.

17              MR. HOWARD:  Yes, sir.

18              THE COURT:  So you're saying that in the *Daubert*

19     hearing, and you've cited the pages, 74 to 76, that the agents

20     testified that there were no image matches between TB2 and the

21     defendant's computer, correct?

22              MR. HOWARD:  That's how I understood his testimony.

23              THE COURT:  Okay.  The trouble is that there's

24     probable cause to search his computer.  His computer is

25     searched.  Once his computer is searched, whether they found

1    images from TB2 or not, he's got evidence of possession of

2    child pornography.  So how do you get around that?

3              MR. HOWARD:  Well, what -- what Mr. Cottom's arguing

4    to the Court is that there's no way for this Court or any trier

5    of fact to determine that it was, in fact, him that, one,

6    obtained those images; two --

7              THE COURT:  Mr. Huyck tried this same defense and

8    he's in jail for five years because he didn't take the deal.

9              MR. HOWARD:  I've got a couple more points.

10             THE COURT:  Okay.

11             MR. HOWARD:  But I -- I understand what you're saying

12   loud and clear.

13         The second argument would be that this is a date-specific

14   offense.  And my client doesn't believe that they can establish

15   that he was accessing between those particular dates as cited

16   in --

17             THE COURT:  But don't they have evidence of his

18   machine accessing one of those servers on a series of dates?

19             MR. HOWARD:  No.  They only have a IP access.

20             THE COURT:  Exactly.  His IP address.

21             MR. HOWARD:  Right.  But there's no --

22             THE COURT:  But it's not him that did it.

23             MR. HOWARD:  And it's not on his machine is what he's

24   arguing.

25             THE COURT:  Mr. Huyck argued that and I think we've

1    had one or two other trials that have argued that and they've

2    all failed.  Because the images are on your client's machine,

3    evidence of the images are.  And your client has a high degree

4    of sophistication on how to operate computers.  He knows how to

5    wipe machines.  He knows how to manipulate machines and all

6    that comes out in the evidence and the only evidence the

7    government has are these old images on his -- on the hard drive

8    of his machine.  And you're going to tell the jury that those

9    weren't me, they were somebody else that put those images on

10   there, and it was somebody else that erased -- or tried to

11   erase those images, it wasn't me, because I didn't know I had

12   possession and I didn't receive any of these images.  That's

13   your argument.

14           MR. HOWARD:  The -- the -- in part, but also the

15   images -- many of these images were also cached or what's in

16   unallocated space.

17           THE COURT:  Space, right.

18           MR. HOWARD:  Okay.  So it -- for the casual user

19   using that machine, they weren't going to necessarily be able

20   to just open it up and see those images.  My client asserts

21   that --

22           THE COURT:  Yeah, it would take somebody that knew

23   how to get rid of them, or at least try to get rid of them.

24           MR. HOWARD:  Judge, my client purports to the Court

25   that there's no evidence of any destruction of any of these

1    images or any --

2         THE COURT:  They're just there.

3         MR. HOWARD:  He's presenting to the Court that the

4    images are simply browser cache and that they're not something

5    that he ever personally ever looked at.

6        It's unfortunate that they're on his machine, very

7    unfortunate, but, again --

8         THE COURT:  And he has evidence that somebody else

9    used his machine?  So who's he going to throw under the bus?

10        MR. HOWARD:  I don't have a name for the Court.

11        THE COURT:  Okay.

12        MR. HOWARD:  What he -- what he advised me is that

13   because he is so involved with computers that he often has

14   people come over to his house and they stay late and he teaches

15   them things on how to use the computer and oftentimes he will

16   leave them unsupervised at his machine.  He denied possession

17   when he was interviewed, when they searched, and but for the

18   plea, he's maintained his innocence from the beginning.

19        THE COURT:  So he's saying that he lied during the

20   plea?

21       (The defendant and Mr. Howard conferred.)

22        MR. HOWARD:  Yeah, Your Honor, he --

23        THE COURT:  No, no.  He lied during the plea.  He

24   told me that he was in possession, knowing possession.

25   Correct?

```
 1              MR. HOWARD:  He was under a great -- yes.
 2              THE COURT:  Okay.
 3              MR. HOWARD:  He was under a great deal of stress from
 4    me.  He was under a great deal of stress.  He had misunderstood
 5    the evidence, is what he is saying today.
 6         And I guess the second part --
 7              THE COURT:  So if he goes to trial he can't take the
 8    witness stand.
 9              MR. HOWARD:  Well --
10              THE COURT:  Because if he goes to trial and takes the
11    witness stand, then the plea colloquy comes out for him because
12    he's already admitted that he did it.
13              MR. HOWARD:  Yes.  And to back up, he's already
14    waived his right to a jury.  So were you to grant this, or you
15    grant this request, it goes to you, Your Honor.
16              THE COURT:  Oh, God.
17              MR. HOWARD:  So you already know -- you already
18    reviewed the PSI, the PSR.  You've already heard him admit to
19    you.  So it's -- it's a very uphill task that Mr. Cottom wants
20    to embark on.
21         But it gets to my second point.
22         Under the -- the Rule 11, the defendant must show you a
23    fair and just request for the withdrawal.  And I think that
24    goes down to the fact that he'd have to be insane to be asking
25    for this unless he truly believed that he didn't do this.
```

```
 1            And so if --

 2                 THE COURT:  So it's -- okay.  So -- so his fair and

 3       just reason is he -- first of all, he doesn't think the

 4       government can prove the case.  Correct?

 5                 MR. HOWARD:  Correct.

 6                 THE COURT:  Okay.  All right.

 7                 MR. HOWARD:  I can also --

 8                 THE COURT:  I'm sorry I keep interrupting you, but go

 9       ahead.

10                 MR. HOWARD:  No.  I appreciate you doing that.

11            I can also advise the Court that the government was very

12       good as to accommodate a reverse proffer --

13                 THE COURT:  So tell me what a reverse proffer is.

14                 MR. HOWARD:  It was my first, but Mr. Becker was good

15       enough as to come back into town and for about two hours, I

16       believe it was, we sat through a recitation of the evidence

17       against Mr. Cottom.  In a very professional manner, the United

18       States government sat across the table from us with a monitor

19       and walked us through step by step.  We actually had our

20       forensic expert sit down with us and -- for that reverse

21       proffer.  And Mr. Cottom was allowed to see every bit of

22       evidence that the government intends to --

23                 THE COURT:  Produce.

24                 MR. HOWARD:  -- show the Court --

25                 THE COURT:  Yeah.
```

```
 1            MR. HOWARD:  -- should we go to trial.  And after
 2   reviewing that, it was still my client's wish to withdraw his
 3   plea.
 4            THE COURT:  Okay.  And the basis -- and of course
 5   I've never seen a reverse proffer.
 6        So the basis for his -- I mean, what is fair and just that
 7   requires me to allow him to withdraw his plea based on the
 8   reverse proffer?  I mean, where is the gap?  The gap is -- I
 9   just need to understand from your standpoint what the gap in
10   the evidence is.
11        The gap in the evidence is that there is no direct --
12   there are no images from the server, the TB2 --
13            MR. HOWARD:  That's correct.
14            THE COURT:  -- on your client's hard drive.  Correct?
15            MR. HOWARD:  That's what --
16            THE COURT:  That's number one.
17            MR. HOWARD:  Yes, sir.
18            THE COURT:  And number two, the images that are there
19   are in the browser cache and it's his position that anybody
20   could have browsed the Internet and those images would have
21   been stored in the browser cache --
22            MR. HOWARD:  That's correct.
23            THE COURT:  -- in unallocated space?
24            MR. HOWARD:  Yes.  His assertion to the Court is that
25   there are no -- there are no true images.  Everything is a
```

1    thumbnail or cache.

2              THE COURT:  And I've seen those and I understand what

3    those are, but they can be brought up if somebody has

4    appropriate expertise because the government's able to bring

5    them up.  Okay.

6              MR. HOWARD:  And --

7              THE COURT:  And what else?

8              MR. HOWARD:  Well, you know, we -- we -- he -- we had

9    believed that they -- that there were, in fact, images from TB2

10   on his machine up until the 3rd -- August 3rd, that hearing.

11   I -- I guess to me it didn't resonate as much at the hearing.

12   And then reviewing the transcript, the way he interprets that

13   is essentially as new evidence.

14             THE COURT:  Okay.  So how -- how does the government

15   identify your client, other than his IP address on TB2?

16             MR. HOWARD:  I don't think that -- our position is

17   that they can't.

18             THE COURT:  Well, then how did they?

19             MR. HOWARD:  I'm sorry?

20             THE COURT:  How did they get your client's name out

21   of the universe of people that are using the Internet?

22             MR. HOWARD:  Well, the IP address that the NIT

23   identified was then backtracked through subpoena process --

24             THE COURT:  Okay.

25             MR. HOWARD:  -- and that --

1          THE COURT:  So his IP address shows up on the --

2     because of the flash drive.

3          MR. HOWARD:  That's correct.

4          THE COURT:  Okay.

5          MR. HOWARD:  Um-hum.

6          THE COURT:  And when he was -- when the IP address

7     viewed TB2 is on -- is identified by the government.  And he

8     doesn't have an alibi for that time, correct?

9          MR. HOWARD:  One moment, please.

10     (Mr. Howard and the defendant conferred.)

11          MR. HOWARD:  Mr. Cottom argues to the Court that the

12     viewing wasn't in fact a viewing by a -- by a person, because

13     there's no --

14          THE COURT:  Who's the person?  Or is it not your

15     client?  I mean, that's why I say an alibi.  Does he have an

16     alibi or not?  And if he doesn't, then it seems to me that

17     we're in a bad situation for him.

18     (The court reporter requested clarification.)

19          THE COURT:  So it was a machine and no person

20     attached to it.  It just -- I understood you to say that it

21     wasn't him, it was somebody else.

22          MR. HOWARD:  Well, I -- maybe it wasn't even a person

23     because Mr. Cottom asserts that there's an index of --

24     (The defendant conferred with Mr. Howard.)

25          THE COURT:  Your client is either on the record or

1    he's not on the record so --

2             MR. HOWARD:  I think it should be on the record.

3             THE COURT:  Okay.

4             MR. HOWARD:  Mr. Cottom, would you like to address

5    the judge?

6             THE DEFENDANT:  Yes.

7             MR. HOWARD:  Why don't you stand.

8             THE DEFENDANT:  I got the source code for the TB2

9    site.  And there's two web pages that I'm accused of viewing.

10   The first one is the girls/index page and the second one is

11   1481.  If you -- on the source code for girls, the index page,

12   there is no link for 1481 on that page.  So there's no way to

13   click to go to the next page.

14            THE COURT:  So they just made up the number and came

15   up with your IP address?

16            THE DEFENDANT:  Well, JavaScript had to be enabled

17   for the NIT to work on TB2, so JavaScript can easily make it

18   seem like --

19            THE COURT:  Say what?

20            THE DEFENDANT:  JavaScript can make it seem like you

21   visited thousands of sites.  I don't know if you've ever

22   clicked on the wrong link and the JavaScript takes over and

23   opens multiple windows.  That's what JavaScript can do.

24        And the fact that there's no link for 1481 on that

25   girls/index page --

```
 1            (The court reporter requested clarification.)

 2            THE DEFENDANT:  There's no link for 1481.html, the

 3    girls/index page, so a human couldn't have followed that link.

 4    It would have to have been direct.

 5            THE COURT:  It would have to have been what?

 6            THE DEFENDANT:  It would have to have been direct.

 7    And, you know, they said that I came into the page and --

 8    There's just this one visit during the entire sting, 14 minutes

 9    after it started.  And that link, for the second page --

10    because the NIT only hit on two pages.  And that link isn't

11    there.  So you couldn't click it.

12            THE COURT:  All right.  Anything else, Mr. Howard?

13        (Mr. Howard and the defendant conferred.)

14            THE COURT:  So, gentlemen, let's just go off the

15    record for a little bit.  Let me get my notes caught up and

16    then when I'm ready we'll start again.

17            MR. HOWARD:  Thank you, sir.

18        (Mr. Howard continued to confer with the defendant.)

19            THE COURT:  All right.  If we could go back on the

20    record.

21        So, Mr. Howard, anything further?

22            MR. HOWARD:  Yes.  Mr. Cottom would like to say a

23    couple more things to you, Your Honor.

24            THE COURT:  All right.

25            THE DEFENDANT:  In the -- there's three people who
```

1    examined it, my hard drives:  Adrian, Paul, and Robert Webber.

2          And I would use their testimony to prove my contentions,

3    what I'm arguing to the Court.  I would use them.  It's in

4    their reports.  There's exculpatory information in the reports

5    but they hide it in a -- in kind of a clever way.  But it's

6    there.  I mean, they say that -- from what I've seen from the

7    appellate decisions they have to prove that, you know, you were

8    searching for child -- child pornography.  And Adrian examined

9    most of my devices.  She [*sic*] found no files of interest on

10   most of my devices.  And she also did a diligent review of the

11   search terms of the three browsers that were on the -- the

12   computer.  And she did an extensive keyword search through

13   there to find evidence of that and she found nothing.

14         And so -- Paul also did a beautiful job of examining the

15   hard drives and he also found no actual files were on the

16   computer.  What he found was browser cache and he found

17   thumbnails.  And he -- he doesn't say explicitly, but I can

18   read in his -- that he would testify that all those thumbnails

19   referred to truka vines (phonetic) that he could not find, and

20   she did not find any.

21         And so what happens is, if someone plugs a thumb drive

22   into your computer and that thumb drive happens to have a

23   folder that has these images on it, it will show up in that

24   hidden thumbnail directory.  And he documents that.  And that's

25   what his report says.

```
 1            (Mr. Howard conferred with the defendant.)

 2            THE DEFENDANT:  Robert -- for SA Smith's testimony,

 3    is what -- on the 3rd of August, is what really got me upset.

 4    Because Robert Webber issued this final report on December

 5    13th --

 6            MR. HOWARD:  Of 2014.

 7            THE DEFENDANT:  -- of 2013, I think.

 8       (Mr. Howard and the defendant conferred.)

 9            THE DEFENDANT:  But it was Robert Webber.  And he

10    says that he found hash matches for all three of the sites for

11    this investigation.  And he didn't declare that these were all

12    also in rekonq browser cache.  And SA Smith also testified that

13    these images that are in Robert Webber's report did not come

14    from those three websites.  And he knew that.  These were from

15    other websites.

16       And I didn't learn that until recently when I was really

17    examining it.  Because I don't know if you read the note that I

18    wrote you or not, but all my concentration was on trying to

19    defeat the NIT at the *Daubert* hearing.

20            THE COURT:  Okay.

21            THE DEFENDANT:  And a lot of people have tried to

22    help me with it but it's very hard to get, you know -- it's --

23    it's a very specific expertise.  And you need a different

24    expertise to actually -- to have this, but I'd always suspected

25    that it was always browser cache.  And then when I saw, how I
```

1   explained, that these two hits couldn't have happened by a

2   human because that second link isn't there, that's what really

3   got me incensed.

4            THE COURT:  All right.  Thank you.

5            THE DEFENDANT:  There's more technical things I can

6   get into about the gallery.php, which is actually the back end

7   that runs this.  And I've -- I know a lot about that.

8            THE COURT:  Well, and that has to do with your

9   hearsay objection.

10            THE DEFENDANT:  Exactly because what it --

11            THE COURT:  Well, your hearsay objection is a legal

12   argument.

13            THE DEFENDANT:  Yes.

14            THE COURT:  And I'm not persuaded by your legal

15   argument on the hearsay objection.

16            THE DEFENDANT:  Okay.

17            THE COURT:  And so that would be a matter of law that

18   you can take up with the court in the circuit, but I'm not

19   persuaded by the hearsay objection.

20            THE DEFENDANT:  Okay.

21            THE COURT:  All right.  So let the government have an

22   opportunity to respond and then I'll come back to you,

23   Mr. Howard.

24            MR. HOWARD:  Thank you.

25            THE COURT:  All right.  So just give me a second

1    here, Mr. Norris.

2        All right.  So, Mr. Norris.

3            MR. NORRIS:  Your Honor, if we may, I'm going to

4    address the argument and then I'm going to defer to Mr. Becker

5    for any more technical responses to some of the allegations.

6            THE COURT:  All right.  Let me just -- let me just

7    start with a couple of observations and then -- and then we'll

8    proceed from there.

9            MR. NORRIS:  Sure.

10           THE COURT:  Now, the plea agreement is really clear

11   that Mr. Cottom cannot withdraw his guilty plea.  That's part

12   of the plea agreement.  And I understand the contractual

13   obligation that Mr. Cottom has set himself up for under the law

14   and that the standard for withdrawing the guilty plea is very

15   high, especially when there's a plea agreement.

16       But at the same time, I'm concerned about the rules effect

17   that the defendant -- if the defendant can show a fair and just

18   reason for requesting a withdrawal, that he ought to be able

19   to -- I don't want to say notwithstanding the plea agreement,

20   but at least in consideration of the plea agreement.

21       So I -- I understand the government's argument with

22   respect to the plea agreement.  And I understand the import of

23   the government's argument with respect to the plea agreement

24   and the obligations under the plea agreement.

25       I would like to hear the government's response with

 1    respect to the fairness issues.  That's really what I'm

 2    interested in.

 3         So if you -- you can proceed.

 4         MR. NORRIS:  And that's what I intended to do.  I

 5    think the brief speaks for itself as far as the waiver.  I

 6    think the plea agreement speaks for itself as far as the

 7    waiver.

 8         So I -- what you're really looking at, is there a fair and

 9    just reason?  There's no other prong under the law, other than

10    is there a fair and just reason?  There's no reason to reject

11    the plea agreement.  Nothing has been proffered.  Nothing has

12    been suggested.

13         And I would submit to you that a desire to continue to

14    drag this out so that I don't have to go to prison is not a

15    fair and -- and just reason for insisting upon the withdrawal

16    of the plea.

17         Now, you -- you've done in your questioning a good job of

18    setting forth many of the arguments that we're going to talk to

19    you about.  The fact that there was -- the NIT itself shows up

20    on his -- through the Flash application.  We know that his IP

21    address was on TB2.

22         The suggestion that it could have been done by a machine

23    or done something else the Court knows is belied by the

24    evidence that the government would present and has presented in

25    other cases.  If you hit TB2 on the Tor network, you are not

```
1    going to -- the NIT is not going to deploy.  You have to
2    physically go beyond the TB2 title page and you have to get to
3    sites on TB2 in which there is child pornography.  And that's
4    when the NIT deploys.
5         So that is -- the suggestion that some machine did this or
6    that this was not a intentional act is belied --
7              THE COURT:  I think his assertion though is that
8    you can -- you can be on a web browser and that you can open
9    the menu page and the JavaScript will open the follow-on pages
10   and then -- automatically, and then that'll trigger the Flash
11   application.
12             MR. NORRIS:  I'm going to defer to Mr. Becker on
13   that, but that's not -- that's not how the NIT was designed to
14   work.
15             THE COURT:  Okay.
16             MR. NORRIS:  The NIT was designed to work to make
17   sure that if you -- first of all, you've got to go to the Tor
18   network.  So when you go to the Tor network, then you have to
19   start looking for child pornography on the Tor network.  And
20   then when you get to that -- that TB2 cover page, for lack of a
21   better term, it's still not going to deploy.  And then you have
22   to go somewhere where the NIT will deploy before it deploys.
23        Whether or not JavaScript can impact that at any level, I
24   find it hard to believe that JavaScript is negotiating your way
25   through the Tor network to a child pornographic site, to an
```

1    area that --

2              THE COURT:  I don't think that -- I think his

3    assertion is that he -- that JavaScript doesn't negotiate him

4    to the -- to the web -- to the web page or the website, but

5    that JavaScript automatically opens up all of the pages behind

6    the menu.

7              MR. NORRIS:  Okay.

8              THE COURT:  Okay.  And you're saying that the -- that

9    it's not designed to do that.

10             MR. NORRIS:  I'm saying that's a ridiculous argument

11   because you still have to drive the car all the way to where

12   you intend to be.  And then -- it's not like the automatic car

13   drives you the rest of the way.  That's not -- that should not

14   be an excuse.

15             THE COURT:  Okay.

16             MR. NORRIS:  The IP also, as the Court is aware,

17   gives up what your operating system is.  And it gives up the

18   architecture of -- of your computers.

19        So the NIT --

20             THE COURT:  Would it give up -- if there's a thumb

21   drive attached, would it give up that architecture or not?  It

22   doesn't, does it?  It just gives you the operating system but

23   not the storage system, correct?

24             MR. NORRIS:  I don't know the answer to that.  And

25   perhaps Mr. Becker does.  So if he does, I'm going to defer to

1    him and ask him to answer your question.

2           THE COURT:  I don't recall that it did in any of the

3    evidence that we've seen.

4           MR. NORRIS:  I don't think it did in any of the

5    evidence we've seen but I'm taking it a step further as far as

6    the technology goes.

7           THE COURT:  Okay.

8           MR. BECKER:  And that's fair, Your Honor.  So I think

9    it's important to recall, because the defendant confuses these

10   issues, is that there are multiple pieces of evidence that come

11   from multiple sources, in terms of the full picture of evidence

12   against the defendant.

13       And so the government was in control of the website TB2

14   and that means there are logs of activity from that website.

15   That's one batch of evidence.  And some of the government's

16   evidence comes from those logs, including Apache logs which

17   Special Agent Smith testified about at our last hearing.

18       Then there is also information that is generated and

19   collected via use of the NIT, and that's a separate batch of

20   information.

21       Then this information gets put together to create a full

22   picture.

23       Now, the NIT generates -- or the NIT causes an action that

24   generates IP address information, an operating system, the

25   architecture, and I believe that was it for this -- this

 1    particular NIT.

 2         And so the NIT tells you here's an IP, here's what sort of

 3    operating system.  And in this case that was Mr. Cottom's IP

 4    and a Linux operating system.

 5         Now, you combine that with data from the logs from the

 6    website, you get some additional information.

 7              THE COURT:  So stop for me.

 8              MR. BECKER:  Sure.

 9              THE COURT:  You get the IP address, you get the

10    operating system, and what else do you get?

11              MR. BECKER:  The operating system architecture --

12              THE COURT:  Oh, the architecture, all right.

13              MR. BECKER:  -- is the other piece.

14              THE COURT:  All right.  I'm sorry.  Go ahead.

15              MR. BECKER:  Now, you combine that with the other

16    information from the board logs and that includes a -- as

17    Special Agent Smith testified about, a browser string.  And so

18    that tells you what kind of web browser is this user deploying.

19    And here that was rekonq, R-E-K-O-N-Q, which is the -- a web

20    browser for the Linux operating system.

21         And so you put those pieces of evidence together and you

22    have a user from Mr. Cottom's IP with a Linux operating system

23    and a rekonq browser.  Special Agent Smith testified at our

24    last hearing he reviewed the Apache web logs for the TB2

25    website and the -- there was one instance, while the government

 1    was in control of TB2, one, where someone with a Linux

 2    operating system and rekonq browser accessed the site, and it

 3    was Mr. Cottom's IP, and that's it.

 4         So, you know, that's the full picture of the evidence just

 5    from the server side and -- from the board side of things.

 6              THE COURT:  Okay.  And so what's the evidence about

 7    what the rekonq browser was doing at that time?  How much --

 8    how much -- how much time was it on --

 9              MR. BECKER:  Right.

10              THE COURT:  -- and what pages were accessed?

11              MR. BECKER:  So the -- and we went through this in

12    detail in the reverse proffer with Mr. Cottom.

13         The browser navigates to the home page of the website,

14    then to the girls forum, it's actually called PT Girls,

15    although it shows up in the log as the girls forum.

16              THE COURT:  Okay.  And how many forums are there?

17              MR. BECKER:  I -- I don't --

18              THE COURT:  More than one?

19              MR. BECKER:  There are more than one.

20              THE COURT:  But this -- they only -- this browser

21    only accessed one?

22              MR. BECKER:  Yeah, so it's --

23              THE COURT:  Okay.

24              MR. BECKER:  -- home page, PT Girls forum, a

25    particular thread message -- a message thread with images

 1    within the PT Girls forum that's number 1481.  That's just a

 2    number the website assigns for different message threads.

 3                THE COURT:  And there's -- there's -- there are --

 4    there are the possibility of more than one thread for this

 5    forum?

 6                MR. BECKER:  Yes.  The PT Girls forum --

 7                THE COURT:  Okay.

 8                MR. BECKER:  -- has a number of message threads with

 9    images that are embedded within them.

10                THE COURT:  Okay.  Go ahead.

11                MR. BECKER:  And then also the second page of the --

12    the second page of that PT Girls forum -- and I don't have my

13    note -- I don't -- I apologize, Your Honor, I don't have my

14    notes with me.  It's either the second page of the PT Girls

15    forum or the second page of thread 1481 and I just don't have

16    that with me right now.

17         And those are the actions that are commemorated by -- by

18    the board side.  And we've shown the defense all of the images

19    of child pornography that exist, particularly on, not only the

20    PT Girls forum, but on the thread 1481.  There are a number of

21    them, about 30, of prepubescent girls posed lasciviously and

22    also images that include penetration of prepubescent --

23    prepubescent females -- or female or females.

24         And so that's -- that's the board side.  Again, that's

25    accessing with intent to view from Kirk Cottom's IP address on

1    November 18th of 2012.

2              THE COURT:  And you can -- you can pinpoint the time

3    though, exact as well, correct?

4              MR. BECKER:  Yes.  There are date and time signatures

5    for all of those actions from the board logs.

6              THE COURT:  And do you recall how long the IP address

7    was on the server?

8              MR. BECKER:  It's about -- in terms of the -- in

9    terms of that full browsing session, it's -- it's not -- it's

10   not lengthy.  The defendant's -- that's not incorrect.  It's

11   probably ten minutes.

12             THE COURT:  Okay.

13             MR. BECKER:  Fifteen maybe.  And I just don't have

14   the figures in front of me.  But that's --

15             THE COURT:  Generally.

16             MR. BECKER:  -- all disclosed to the defendant

17   year -- a year ago or more.

18             THE COURT:  Correct.

19             MR. BECKER:  I mean, that's information the defense

20   has had since the beginning of discovery in this case.

21             THE COURT:  And discovery started in -- it started

22   last year?

23             MR. BECKER:  Longer, no.  So the defendant was

24   charged in April of 2013.

25             THE COURT:  Okay.  All right.  Thank you.

1          MR. BECKER:  And so it would have been shortly

2     thereafter, initially provided to Mr. Gross.

3          THE COURT:  Go ahead.

4          MR. BECKER:  So, you know, that's -- that's the board

5     side.

6        There's no evidence that these actions could have been

7     robot-generated or, you know, not user-generated.  And, you

8     know, Mr. Norris's analogy is totally on point, and that's that

9     even if the defendant is -- is going to say, well, the rest of

10    the actions could have been automatically generated by Java,

11    which we dispute, he's admitting that he went there.  In order

12    to make that argument, he's just made the admission, well, I

13    went to the website --

14          THE COURT:  Well, he's saying --

15          MR. BECKER:  -- but the rest of those actions --

16          THE COURT:  -- his IP went to the website.

17          MR. BECKER:  Sorry.  Someone who he refuses to name

18    in his failure and refusal to give any alibi went to the

19    website and then the JavaScript took over from there and who

20    knows what happened.

21        There's no actual evidence though of that.  And, of

22    course, the defendant's had a team of experts that looked at

23    the website and the NIT.  Did they report anything like that?

24    Did they report that, well, we found some JavaScript code that

25    appears to have the ability to create user actions where there

 1    were none?  No, they didn't.

 2         Has Mr. Kasal, who's had a chance to examine all these

 3    things, reported any information that this website had some

 4    malicious ability to create user actions where there were none?

 5    No.

 6         There's no evidence in the record to -- to support any

 7    sort of argument like that.

 8         So, you know, that -- and frankly, Special Agent Smith's

 9    testimony we think was clear on all these points.  The Court

10    has the transcript of that.

11         He also spoke to the rest of the issues that I'll get to

12    now.  And that's -- so that's the board side, the server side

13    of things.

14         And then we have a number of months later the search of

15    Mr. Cottom's home and the recovery of evidence.

16         Now, of course, the set of evidence that is recovered by

17    the government is necessarily incomplete because there is a

18    fully encrypted laptop computer that is seized but that we

19    cannot examine.  And so that's always going to be a factor and

20    a circumstantial factor here.

21              THE COURT:  Okay, just a second.

22         Mr. Cottom --

23              THE DEFENDANT:  Oh, sorry.

24              THE COURT:  If you're going to talk to your lawyer,

25    you need to turn the microphone away and you need to be quiet

 1    enough so that it doesn't interfere with my court reporter's

 2    ability to take down the testimony.

 3              THE DEFENDANT:  I'm sorry.

 4              THE COURT:  Or to take down argument.

 5         So Mr. Becker, you may continue.

 6              MR. BECKER:  Thank you.

 7              THE COURT:  So we're talking about the government

 8    seized an encrypted computer, okay.

 9              MR. BECKER:  Yes.

10              THE COURT:  And then from there?

11              MR. BECKER:  So one of the devices, fully encrypted,

12    unable to be examined.  So that's a piece of the evidence there

13    and an important one.  Because Mr. Cottom's argument is, well,

14    there's an absence of -- well, there -- he ignores the

15    inculpatory facets of evidence and says, well, there's stuff

16    they didn't find and therefore that's exculpatory.

17         Well, what is there, of course -- and let me clarify the

18    issue with the images from TB2.  We've made this very clear

19    from the start and from when this was disclosed to prior

20    counsel.  There are 11 images of child pornography on the

21    defendant's devices that were available on TB2.  And so

22    here's -- and here's how that breaks down.

23         There are -- you know, let's just use round numbers.

24    Let's say there are a thousand images of child pornography on

25    the TB2 website.  The FBI created a hash set for those images.

1    That means they took the hash value of each image, the unique

2    numerical value, and then created a list.  And so when you're

3    searching a machine, you can then run that hash list against

4    the machine and figure out, okay, does this person have any

5    images that were available on this website?  And that's what

6    was done.

7         And there are 11 images on Cottom's machine that were

8    available on TB2.

9         Now, that doesn't --

10        THE COURT:  All the images were on his unallocated

11   space in his browser cache, right?

12        MR. BECKER:  That's correct.  They were either cache

13   or in unallocated space.  That's correct.  Now, that doesn't

14   mean necessarily that the images were downloaded from TB2.

15   What that means -- it's circumstantial evidence.  What that

16   means is that those were images that were available on that

17   website.

18        Now, from a visual comparison, and we ran through this

19   with the defendant, one of those images on his computer is an

20   exact match for one of the images on one of the pages on TB2

21   that he accessed.  And we have shown the defendant that.

22        So it's on his computer.  It's in unallocated space.  It

23   was carved during exam.  And it is an exact match for one of

24   the images on one of the pages that he accessed when we

25   captured his IP.

1          THE COURT:  It's -- okay.  It's visually exact but

2     the computer's signi- -- so there's three things, really.

3     There's the hash value, that's one.  And so you've identified

4     11 images that have the same hash value on his computer and on

5     the website.

6          MR. BECKER:  Yeah.

7          THE COURT:  The other is a visual comparison and

8     you've identified one of those.

9          And the other would be some kind of digital comparison.

10    And I've never heard anything about that because nobody's got

11    down to that far --

12         MR. BECKER:  I guess we can ignore three.

13         THE COURT:  Right.

14         MR. BECKER:  There's just one and two.

15         THE COURT:  Okay.  From your standpoint.

16         MR. BECKER:  Right.

17         THE COURT:  Okay.

18         MR. BECKER:  And, you know, Special Agent Smith's

19    testimony at the hearing was very clear.  That doesn't tell us

20    this image was downloaded from TB2.  And Special Agent Smith,

21    again, totally clear about that testimony.

22         THE COURT:  Okay.  Is there any -- is there any way

23    that you can trace an image that was downloaded from TB2 to

24    anybody's computer, once you get the other computer?

25         MR. BECKER:  So yes and no.  There wasn't anything

1    that was deployed on the website by the FBI that would

2    necessarily do that.

3         Sometimes, depending on the image you're examining, so

4    when you look at -- when we're looking at images on

5    Mr. Cottom's devices, there is information in some of those

6    images that tells us what website was this downloaded from.

7    And we went through this with Mr. Cottom as well.  So there are

8    a number of images in either browser cache or unallocated space

9    where there was metadata within the image.  And the metadata

10   told us it came from a Tor network child pornography website.

11             THE COURT:  Oh, okay.  But not what website?

12             MR. BECKER:  It's a manual process and so there's

13   2,000 or so of those images.  The examiner went through about

14   eight of them.  Because it's a manual process, it takes time.

15   And each of those eight images the examiner went through had

16   been downloaded from a Tor network child pornography website.

17   Those are the images that made up the receipt charge in the

18   Western District of New York indictment.  Because there are

19   dates and times of the receipt and we know what website those

20   images came from.

21             THE COURT:  Okay.

22             MR. BECKER:  And so that's the receipt charge.

23   Again, we went through this with him.

24         Now, given further time, the examiner could go through

25   another thousand of those images.  It's just that that process

1    is manual and takes a great deal of time.  So it is possible to

2    figure out, even for unallocated and browser cache images, what

3    website did they come from and when.  Sometimes that metadata's

4    there and sometimes it's not.

5              THE COURT:  But the metadata doesn't show that it

6    came from TB2?

7              MR. BECKER:  The eight images that we pulled that

8    data from did not show that they came from TB2.  They were from

9    other Tor network child pornography websites, which of course

10   is in and of itself inculpatory evidence --

11             THE COURT:  Exactly.

12             MR. BECKER:  -- because also on Mr. Cottom's computer

13   is a large amount of evidence of browsing of known Tor network

14   child pornography websites.

15        Now, the -- the browser evidence that -- that was found in

16   his computers didn't find evidence of browsing of TB2.  He --

17   they're aware of that.  But website after website, Tor network

18   child pornography website after Tor network child pornography

19   website in the browsing history are there.

20             THE COURT:  Okay.  And in the browsing history

21   does -- is there enough metadata or enough data to show the

22   times and dates of the browsing or not?

23             MR. BECKER:  Yes, there are -- there are dates and

24   times in that browsing history, as well as if you -- when you

25   look at the URLs, the Court's seen similar testimony to this,

```
 1    when you look at a website URL, oftentimes there's an image,

 2    like a dot-JPEG at the end that tells you, okay, this person's,

 3    one, on a Tor network child pornography website; and, two, by

 4    the URL you can tell, oh, they're looking at an image, looking

 5    at another image.  And that sort of evidence is there.  We've

 6    gone through it with the defendant.

 7               THE COURT:  Okay.

 8               MR. BECKER:  And so, you know, it really -- I think

 9    that where we're stuck here with Mr. Cottom, just really

10    appears to be a failure to appreciate the legal premise of

11    circumstantial evidence here.  And the fixation on, you know,

12    the -- there's not -- the exact images that were captured on

13    the board, but for one, are not on my computer or they can't

14    say -- can't prove that those images are on my computer and --

15               THE COURT:  Or that I was the one that actually did

16    it.

17               MR. BECKER:  Right.  Now, on that point, Judge, of

18    course the government's evidence, and I -- is that --

19    Mr. Cottom lives alone.  The user account name that pertinent

20    evidence is found under is adama, A-D-A-M-A.  It's a name

21    that's pertinent to the television program Battlestar

22    Galactica.

23        Mr. Cottom admitted to law enforcement that that is his

24    username.  And that's -- that's the username that he used on

25    his computers.
```

1      There wasn't anyone -- there wasn't anyone in the -- you

2   know, in the home at the time that they searched it.

3   Mr. Cottom admitted using -- knowing how to and using Tor.

4   And, in fact, made at least a sarcastic admission to the

5   government during that interview that he might have looked at

6   some other things while he was drunk but gave a sort of general

7   denial of child pornography.

8      And so it's not as if there's not other inculpatory

9   evidence obtained through the search and the interview.  We

10   obviously -- we didn't have a trial.  We haven't presented all

11   of that --

12           THE COURT:  Right.

13           MR. BECKER:  -- because the defendant admitted he's

14   guilty.

15      And, you know, of course I think added to this in terms of

16   the fairness here, Judge, is that, you know, the government's

17   made substantial efforts here in its negotiations with

18   Mr. Cottom to allow him to continue to pursue the issues -- the

19   legal -- you know, what he sees as the legitimate legal issues

20   that he wishes to pursue on appeal, and that is his challenge

21   to -- the suppression challenge to the network investigative

22   technique, his challenge to the discovery, slash, *Daubert*

23   issues that the Court dealt with at hearing.  And, you know,

24   the government ultimately was -- we were willing to concede to

25   a bench trial and agree to a bench trial, we didn't have to, we

1    were willing to enter into a conditional plea agreement when

2    obviously we don't have to, in order to accommodate his

3    concerns.  We've made information available again and again to

4    experts for review.

5         And it's un- -- maybe unfortunate that Mr. Cottom doesn't

6    agree with his experts or his counsel or anyone, so far as I

7    can see, but I think those are all legitimate factors in terms

8    of Your Honor's analysis of what's fair and just here given the

9    contractual agreement that we ultimately came to with him and

10   what the government's made available.

11        So unless Your Honor has any further questions, I think

12   that's all that we have to present on that issue.

13             THE COURT:  All right.  I'll -- Mr. Howard, I'll give

14   you a chance to respond but I think we need to take about a

15   ten-minute break and then we'll come back and then you can

16   respond.

17             MR. HOWARD:  Thank you, sir.

18             THE COURT:  You're welcome.

19        (Recess taken at 9:25 a.m.)

20        (At 9:45 a.m. on December 16, 2015; with counsel and the

21   defendant present:)

22             THE COURT:  Please be seated.

23        Mr. Howard.

24             MR. HOWARD:  Thank you, Your Honor.

25        Your Honor, just to respond to what the government has

1    presented to the Court.  Mr. Cottom's contention to the Court

2    today, Your Honor, is that on the 3rd, had he understood and

3    appreciated the testimony of the special agent, he really would

4    not have gone through with this.

5         And what he's essentially telling the Court is that he now

6    understands, having reviewed the transcript and having gone

7    through the reverse proffer, that all the government has is --

8    is browser cache for the receipt charges and all the government

9    has is thumbnails for the possession charge.

10        He heard from the special agent on August 3rd, and then

11   kind of came to this better understanding after receiving the

12   transcript, that there are no TB2 images on his machine.

13        He also wants to reiterate to the Court that there really

14   is no, despite what the government contends, there really is no

15   browsing history.  There's browser cache.  But in terms of

16   history of searches, there is no browser history on his

17   machines.

18        And the government contends, regarding the NIT and the

19   Java, that it's impossible that a JavaScript could have taken

20   over and essentially taken -- taken the user from place to

21   place to place.

22        What he is going to argue at trial, should you grant the

23   motion, is that, yes, it could have.  And the way it could have

24   is the experts in our case acknowledged in their supplemental

25   report that it is possible to run the NIT on what's called an

```
 1   IFrame.  And the contention will be, should we go to court, as
 2   I understand it, is that whenever a Tor session is executed or
 3   begun, there is an entry node and an exit node.  And
 4   Mr. Cottom's speculation in this case is that, upon the entry
 5   node, somehow a hacker, perhaps, inserted an IFrame which then
 6   would circle the session back to a TB2 site and then take it
 7   from there, bouncing from -- from site to site.
 8         (The defendant conferred with Mr. Howard.)
 9         MR. HOWARD:  Yeah.  And, you know, he just
10   interjected in my ear and said maybe I should explain that.  So
11   I'm going to defer to him on that theory.
12         THE COURT:  Okay.
13         MR. HOWARD:  And -- but I am going to also point out
14   that -- we talked -- the government talked about the adama and
15   how adama is this character from Battlestar Galactica, but my
16   client advises me if you're allowing us -- if you allow us to
17   go to trial, if you grant our motion, he's going to testify
18   that adama has no rekonq browser.  And, further, that adama was
19   also the -- essentially the guest login.  He's got his own
20   login under Kirk but --  What's that?
21         (The defendant conferred with Mr. Howard.)
22         MR. HOWARD:  Oh, I'm sorry.  It's opposite.  Adama
23   was his but Kirk was for the friends that would come over and
24   use his machine.
25         I'm going to now defer to Mr. Cottom, who's going to
```

 1    better explain his theory on how the -- the NIT could have been

 2    interjected with an IFrame.

 3             THE COURT:  All right.  Just be sure to speak up,

 4    sir.

 5             THE DEFENDANT:  Okay.  Since you've had enough of

 6    these trials, you know how Tor works.  Has entry node, middle

 7    node and exit node.  If you have a malicious exist node, it can

 8    inject IFrames into your stream.  And they can be hit.  So you

 9    can be at "how does Tor work" site.  And if the exit node is

10    injecting you, every time that you click another link, it can

11    inject another IFrame.

12        Now, the problem with the way the NIT was designed on TB2,

13    in my opinion, is that they actually forged the entries for the

14    request_URI, in the visitor's table.  The visitor's table is

15    what holds the session ID that the NIT creates.  Okay?  So that

16    is your only tie to what the Flash app sends back, if you

17    understand me.

18        They forged the -- when I saw that the request_URI and the

19    referral are the same page, that's when I knew that something

20    was going on.  Because if this was a legitimate entry, when you

21    go into girls/index.html and then you click 1481, which I've

22    informed the Court that link was not there, but if that link

23    was there, you click that link, the referrer would then be the

24    girls/index.html.  And your -- your request_URI would be the

25    girls/res/1481.

1       And so when I saw this on my NIT report, that these two

2   entries were the same, that either indicates a reload or a

3   script was at work, performing the actions that you're seeing.

4       And so when I finally got the gallery.php, I saw why the

5   request_URI the Court was seeing.  They're forging the

6   request_URI with a hidden IFrame inside girls.html and

7   1481.html.  And they have a query string.  A query string is a

8   bit of data that you can put out into your request for the

9   IFrame page.  They use that query string to fill in the

10  request_URI.

11      So, set up correctly, they're saying that when you went to

12  girls at HTML, they use this query string to input this is a

13  request_URI.  The problem is, is that you can put that IFrame

14  anywhere on any website and it would still enter that way.  If

15  you follow me.

16      THE COURT:  All right.  Thank you.

17      All right, Mr. Howard, you may continue.

18      (Mr. Howard and the defendant conferred.)

19      MR. HOWARD:  I think I've -- I've covered the points

20  that I wish to make.  I'm going to ask the Court again to grant

21  our motion.

22      THE COURT:  All right.  Let me -- let me review my

23  notes.

24      All right.  And the problem with the plea agreement is, is

25  once the plea agreement is entered into, it's really almost

1    impossible to back out of these plea agreements.

2        The Court goes through a long colloquy, asks the defendant

3    questions under oath to be sure the defendant is doing what he

4    wants to do.

5        And I have no doubt that on the day the plea colloquy

6    occurred, that Mr. Cottom wanted to plead guilty.  That was his

7    decision.

8        Now he's telling me that if he had some additional

9    information, which was included in his review of the *Daubert*

10   hearing, and his reverse proffer with the government, that he

11   would not have decided to take the plea agreement because he

12   doesn't think the bargain that he made at the plea colloquy was

13   in his best interests.  And so he wants to change it.

14       And he's -- and he has two hurdles to overcome.  One are

15   the terms of the plea agreement, which basically waive his

16   right to withdraw the plea, and he -- he did that freely and

17   voluntarily at the time of the plea colloquy.

18       The second is, is that he has to convince the Court that

19   there is a fair and just reason for withdrawing the plea.

20       I -- it could be argued that if a defendant wants a trial,

21   the defendant ought to be able to get the trial and that in

22   itself is a fair and just reason.

23       But I -- and I don't think that legally that's the

24   standard, frankly.

25       And so the defendant effectively has to demonstrate to the

1   Court that the basis for his decision had some element of

2   unfairness, whatever that might be, or that his defense

3   effectively should carry the day and he should be allowed to

4   present his defense at a jury trial.

5        I've tried two or three of three cases.  Judge Smith Camp

6   tried one of these cases.  None of these cases have ever

7   resulted in a defendant's verdict.

8        I tried Mr. Huyck's case, which was probably the thinnest

9   case the government had for conviction, in fact, the government

10  basically asked the Court to include a lesser-included because

11  I'm -- I think the government was not convinced its case was as

12  strong as some of the other cases that were presented, and

13  Mr. Huyck was found guilty.

14       I think that I -- I -- I am convinced that Mr. Becker's

15  argument carries the day, and that is that the defendant is not

16  looking at all of the other circumstantial evidence that the

17  government has that would persuade a trier of fact that he's

18  guilty.

19       And his technical arguments with respect to the connection

20  to the NIT and his -- his IP address's connection to the TB2

21  server do not explain how the government got his IP address and

22  then once they did how they found a computer that had cache

23  that had child pornography images.

24       And once that happens, then it seems to me that it's

25  inevitable that Mr. Cottom would be convicted at trial under

1    the circumstantial evidence.

2        Now, I know that he's waived a jury trial.  I haven't

3    heard all the evidence.  It's possible that I could be

4    persuaded that beyond a reasonable doubt the government hasn't

5    proved its case, but based on what I've seen so far, I don't

6    know that I can say that unequivocally.

7        And -- and -- so the fairness issue really, I think, is

8    unavailing to the defendant.

9        So I'm going to deny the motion to withdraw the guilty

10   plea.

11       We're set for sentencing tomorrow.  So I'll see everyone

12   there.

13       Is there anything further, Mr. Norris?

14           MR. NORRIS:  We do have a pretrial issue that we're

15   still awaiting on that I think probably should be done before

16   sentencing.

17           THE COURT:  And that is?

18           MR. BECKER:  It's the defendant's compliance with

19   pretrial release.  I think there is a violation report on

20   that --

21           THE COURT:  Oh, yeah --

22           MR. NORRIS:  We can do that --

23           THE COURT:  I'll just take that up during sentencing.

24           MR. BECKER:  All right.  The only other issue is that

25   the Court had indicated that it would issue a written ruling on

1    the --

2                THE COURT:  On the *Daubert*?

3                MR. BECKER:  -- on the *Daubert* hearing.

4                THE COURT:  Oh.  Well, I'll double-check on that.

5    I -- the Court may have dropped the ball on that issue.  But

6    I'll double-check.  There might be a draft that I haven't

7    reviewed yet.

8                MR. BECKER:  Okay.  Thank you, Your Honor.

9                THE COURT:  Okay?  All right.  Mr. Howard, anything

10   further?

11               MR. HOWARD:  No.  We'll see you tomorrow, sir.

12               THE COURT:  All right.  We're adjourned.

13        (Recess at 10:01 a.m.)

14                                   * * *

15

16

17

18

19                    C E R T I F I C A T I O N

20        I, Susan M. DeVetter, RDR, CRR, certify that the foregoing

21   is a correct transcript from the record of proceedings in the

22   above-entitled matter.

23

24    */s/ Susan M. DeVetter*            January 20, 2016
      Official Court Reporter                    Date

25